Good afternoon, Your Honors. My name is Garland Cassidy. I'm from North Carolina, and I represent the first appellant you'll hear from today, Garlock Ceiling Technologies. Mr. Monaco and I have agreed to split the time 15 and 15, so Garlock will take 15 total minutes. That's fine. That's fine. Yes, and we've split our time 12 minutes on the rec and 3 minutes for rebuttal.  Thank you, Your Honor. Your Honor, Garlock Ceiling Technologies was a long-time co-defendant of Grace's before it filed for bankruptcy. Prior to Grace's bankruptcy, Garlock and Grace were named together in a continuous stream of thousands of cases, in which plaintiffs alleged injuries to all of the plaintiffs. On the standing issue, what is the relevant injury that we should be looking at? The relevant injury is the injury to Garlock's rights to seek contribution and to be able to identify its co-defendants and receive proper set-off from payments made by the Grace Trust to a joint defendant. So the injury in this case is that Garlock, as a co-defendant, could be held liable in joint in several states. It could be, but in the record, there's no indication of any potential claim, either past, present, or future potential claim against Grace. Is there? Well, not at all, Your Honor. We think before the bankruptcy case, when Garlock and Grace were sued together in thousands of claims, Garlock had rights to contribution in those cases. Now, there's no evidence in the record that Garlock ever needed to assert those rights. Okay. But those rights existed. In fact, a right to contribution, liable at the time of the tort is committed. It was never asserted, though, right? That's correct, Your Honor. It was never asserted. And how long have you been dealing with these asbestos liabilities at Garlock? Garlock has been dealing with asbestos claims for decades. Okay. Yes. Garlock, for decades of time, never asserted a right. And the contingencies that would have to occur in order for there to be a future problem is somebody would have to sue you both, then there would have to be an assertion of joint in several liability and a fining. So having never had it happen before and those things standing in the way, how is this not – explain how this isn't so speculative as to warrant the district court's finding. Well, first of all, Your Honor, I think you're defining down what Garlock's rights would actually be. When Garlock is sued, its rights don't arise when it actually suffers a judgment and pays Grace's share. When Garlock is sued – Sorry, keep your voice up. You're going to have to move that up. That's it. Thank you. I take your point that there's – perhaps in the abstract, some rights exist. But the question we have to deal with is, has there been any injury in fact? Have you suffered some loss? Are you likely to suffer some loss? If you say, I have a right, but that inchoate right is something you've never asserted, it's never been determined to have any value at all, and you've to date not done anything, and there's guesswork about whether that will happen in the future, I'm trying to ask you if you'll wrestle with the district court's specific statement that that's just too speculative. Well, it's not. I think the record is clear that these rights were very valuable to Garlock. Before the bankruptcy case, when Garlock and Grace were sued, Grace was paying the lion's share of the liability. Garlock was a nominal defendant and really paid very small parts of the liability. In 2000 and 2001, there was a bankruptcy wave, and Grace and eight other top-tier defendants went into bankruptcy. And the testimony in this case from the claims expert of the plan proponents was that when that bankruptcy occurred, Garlock and other co-defendants' liabilities multiplied because defendants were able to and did, or plaintiffs, excuse me, were able to and did demand that co-defendants pick up the missing shares. But let me just add to that. I mean, there's bankruptcy standing, that's statutory standing, and then there's constitutional standing. And for there to be constitutional standing, you have to have an injury or possibility of injury that's sufficiently imminent. And what Judge Jordan's getting at, if it was so sufficiently imminent, about to occur, and we've gone all this time without anything occurring, then at some point you don't have standing. I don't believe it's correct to assume that nothing has occurred. There's a plan that's been prepared. What injury have you actually had to you, is there, that's sufficiently imminent? Upon entry of the injunction, Garlock is prohibited in cases in which it's sued from joining Grace, to have Grace held responsible for the share. Okay. During the tendency of the bankruptcy, which is now in excess of 10 years, have you ever filed a proof of claim in the bankruptcy against Grace? No, we have never filed a proof of claim. But the case law is clear that Garlock, that a proof of claim is not necessary. I understand that, but you can't point to a particular case where you paid more than you thought was your share, and you felt that you should have filed a claim for contribution against Grace. That's right. I cannot point to a specific case. Okay. But Garlock still has that right. Garlock has the right. Well, once it gets named in a lawsuit, Garlock has the right to join Grace to that lawsuit. Now, when did Garlock file for protection for Chapter 11? In June of 2010, after the confirmation trial in the Grace case. Now, it's been – well, let me spend just a moment more on standing just to make clear the court understands our position. Once Grace's plan is confirmed and the injunction is entered, then Garlock is – its rights against Grace are permanently taken away. It cannot join Grace, and its rights are replaced by being channeled to a trust, and a trust that we contend operates under – with a lack of transparency, with trust distribution procedures that appear to be designed to make it difficult, if not impossible, for Garlock to actually identify cases in which Garlock and Grace are. But it seems that the only thing that you really have perhaps going for you is that there's a stipulation which says that it's likely that you will be subject to claims. And yet, at some point, likely diminishes when you haven't been subject to claims for such a lengthy period of time. Well, the only reason we haven't been subject to claims, Your Honor, is because Grace is in bankruptcy for the last – Well, I mean, how about before 2010? Before 2010, we were constantly sued in cases in which Grace was a co-defendant, and we constantly benefited from our rights against Grace, because plaintiffs could not seek to recover from Garlock for amounts that they had recovered from Grace. But that's been true for a decade, right? I'm sorry, for a decade? The bankruptcy has been in existence for a decade. Am I correct? Grace has been bankrupt for about 12 years. Right, okay. I take your argument to be we had some – we were getting a benefit in negotiating with asbestos claimants and potential claimants, because we had Grace in front of us. They were running interference, and now because of the injunction and the protections of bankruptcy they're enjoying, we're not getting that. That harms us.  Yes, they were only running interference. If that's the nature of it, the question I'm coming back to is this has been the case for over a decade, and yet there's no proof of claim and there's nothing in the record. You can't point this to anything that shows that in that 10, 12 years, you've suffered any harm by somebody coming to you and suing you and you facing the liability that should have been shared by Grace. Well, I misunderstood the record. Please correct me. No, I think you have misunderstood the record. The stipulation says that Grace and the claim proponents stipulated that during the course of the bankruptcy cadence, a number of individuals who claim to hold asbestos PI claims against Grace have asserted claims against Garlock, alleging that Garlock contributed to their injuries as well. In addition to that, Your Honor, we submitted numerous complaints that were filed by plaintiffs who alleged that if Grace had not been in bankruptcy, they would have sued Grace as well in the cases they were asserting against Garlock. I'm still missing your – I don't mean to be obtuse, but I'm missing your point. The fact that you got sued, your assertion is I'm injured in fact because Grace is in bankruptcy and protected. And the question that's being put to you repeatedly by people up here is when have you ever asserted that you had some monetary injury against them, either by way of proof of claim or a judgment that you can hold up to say this was what we would assert? If it's in there, you haven't pointed to us, and that's what's making it difficult to imagine that, well, it's going to happen in the future. It hasn't happened for the last 12 years, but trust us, it's likely to happen now. No, it has happened in the last 12 years, Your Honor. If Garlock – if it hadn't been for the automatic stay, then in each of those cases in which Garlock was sued and Grace contributed to the injury, Garlock could have joined Grace to the lawsuit and asserted a claim against Grace to make sure that it was held responsible for and paid its share of the injury. Instead, Garlock proceeded in those cases without Grace. This feels a little circular because it sounds to me as if you're saying we would have sued them and we would have had joint several liability and we would have made them contribute but for the automatic stay. And the fact that we never filed a proof of claim, we never showed up in court and said there is joint and several liability and pointed to what we were owed, don't pay attention to that because there was the automatic stay. There would have been no basis for filing a proof of claim, Your Honor, because the code is clear that a contingent contribution claim can't be allowed until it's actually come into fruition. So there would not have been a basis for filing a proof of claim in those circumstances. But we had rights, and those rights are taken away by the injunctive. Okay, you have rights, but you don't have – you apparently don't have any case where you had to pay Plaintiff A, B, or C where you have a claim against Grace or you would have asserted it somewhere. We could not have asserted it in the last several years. I understand you couldn't have asserted it, but you could have asserted it. Nineteen other co-defendants filed proofs of claim in the Grace bankruptcy. You did not. Now, you don't have to, but all I'm asking you to point to, whether you pointed to it in front of either the bankruptcy court or the district court, is there a case where you paid out where you have a claim against Grace? Well, it would be difficult to know that over the last 10 years, Your Honor. Most cases are settled. Garlock suffered a few judgments. The claimants who've actually asserted or claimed against Grace are unknown to Garlock. There have been no claimants who have identified themselves, as far as we know, in the last 10 years, and that's been a problem. The case is – Okay, you settled. You're satisfied. That case is gone. Now, you're trying to articulate that possibly you had a right to have joined Grace, but you didn't join them. How can that be an injury in fact? Because there's an injunction that says we could have. I didn't ask that question. How could that be an injury in fact? Because if Grace were in the case and potentially able to pay a share, then the settlement that Garlock entered into would have been less, just like it was before the bankruptcy. I mean, you're actually – it seems to me that you're admitting that my question forces you to speculate. How is that not – how is the circumstances of that not forcing the court to speculate? Well, there's no speculation about the actual injury, and that is that Garlock is enjoined from ever filing a contribution claim against Grace. Garlock is permanently enjoined. And in future lawsuits, when Garlock – You can file an indirect claim. You can file an indirect claim, just like Montana or the Queen. Under the trust, I can only file an indirect claim when I actually suffer a judgment and pay Grace's share. Outside of the bankruptcy system, outside of bankruptcy law, I could file a suit against Grace the moment I understood that I was sued, and that is a valuable right that is taken away under the plan, and that gives a basis for standing. Your Honor, I see that I'm out of time. We'll get you back on rebuttal then. Thank you very much. Thank you. Mr. Monaco. Good afternoon, Your Honors. May it please the Court. For the record, my name is Frank Monaco, and I represent the State of Montana and Her Majesty the Queen in right of Canada. Your Honor, today's arguments will be essentially the same for both clients, unless I distinguish one from the other, and I would like to leave some rebuttal time. I don't think I'll need more than a minute or two. That's fine. I think the central issue in this case is whether Montana and the Crown's right to payment, which are based on contribution indemnification, are subject to the plan, Section 524 G Trust, and the trust distribution procedure, which I'll refer to as the TDP. Both Montana and the Crown have what, property claims? Only Canada has property damage claims, which were subject of a separate resolution in the Bankruptcy Court, but Canada does have a personal injury claim based on the Raven Thundersky action, which was called for sufficient. They are against each other with what, failure to warn claims? Yes, Your Honor. The concept at the state and provincial level are basically the same, a failure to warn in both instances. In Canada, they were providing military housing and housing to Native Canadians, and that's the Thundersky action resulted from a family that was living in the attic of one of those houses. Is your primary argument that you do not, your clients don't have claims or demands subject to the channeling injunction of 524 G? Well, Your Honor, I think our argument is basically threefold. The first argument is just based on Section 524 G, our claims are not discharged. They're not subject to the trust, and that we have the right to assert these rights to payment against reorganized debt. They're not discharged because? They're not discharged because of the language of the statute, given the legislative history. Mr. Monaco, doesn't 524 G say specifically that the injunction bars claims that directly or indirectly seek to recover? And it also deals with future liability as well as current liability. It says future demands, which is a separate argument that we have. If I could address? Let's stick with directly and indirectly. Why do the words or indirectly not undercut your argument? Well, first of all, Your Honor, the term indirectly, which is the one word in which grace hangs its statutory argument. It's a pretty good word, though. It is, Your Honor, but I don't know what it means exactly. It's not defined in the statute, and if I was to venture an educated guess, I would think that it relates to pre-petition claims that have been liquidated by third parties, such as Montana, which is not our case. All of our claims arise post-petition. Well, usually indirect means what? Contribution or indemnity or something like that, right? Your Honor, that term is not specifically used in the statute. It doesn't show up in the legislative history. Which term? Contribution and indemnification, Your Honor. Let's go back to Judge Jordan's question, because if it's not direct, it's indirect. Is there anything else that occupies the field besides direct and indirect? In other words, if you have claims or demands, direct or indirect, is there anything else besides direct or indirect? It's one or the other, is it not? Your Honor, we would say that we do not presently have a claim with the exception of Montana's claim for contribution. To your knowledge, you don't have any direct claims. We do not, Your Honor. So you don't have any direct claims, and you may have a future claim. That is correct. All right, and that future claim would be based on what you have to pay out for a suit which alleges that either of your clients failed to warn about the danger of asbestos. Okay. That's correct. And your claim will come in the nature of if you have to pay out something on those cases, which in Montana's case have all been settled, correctly? That's not entirely correct, Your Honor. The settlement for $43 million, which was settled and paid in September of 2011, encompassed the 210 lawsuits. All but one were filed against my client post-petition. There are still claims that are being brought, actions against Montana. Okay, most of which have been settled. A few more may still be out there. Your Honor, there may be more than just a few. Okay, all right. But notwithstanding the number and the settlement status of them, these are cases in which your client has either paid or will have to pay, and your claim against Grace will be for what you had to pay on those cases, correct? That is correct. Now, how can that be anything other than indirect? Well, Your Honor, because I think you have to look towards state law and when a right to payment arises. And that's where we get into the whole Frenville-Jeldwin-Owens-Corning trilogy of decisions reached by this court. Before you get into that trilogy, maybe you could drill down on this specific question that I think Judge Fischer is asking you, which is how could that be anything other than indirect? Under common understanding, this is, I think, what Judge Ambrose is getting at, too. In the universe of stuff, direct and indirect would seem to be the code's way of saying everything, whether you call it direct or whether you call it indirect, that there's some kind of claim out there that's neither direct nor indirect that you think you folks are going to be dealing with. Your Honor, I think our future right to payment, when we have to pay, because we do not believe it falls within the technical definition of claim or demand. That's precisely what we're trying to address, Mr. Monaco. Does it fit the technical definition when the claim, when 524G defines things as directly or indirectly being barred? Common parlance, I think, is an indirect claim encompasses contribution and indemnification claims. Do you have any claim, any authority, any case, anything that runs counter to that? I do not, Your Honor. Then why would we, in this setting, say, well, indirect claims often, typically, people understand they mean contribution and indemnification, but it doesn't mean that here. Why would we take that path? Well, Your Honor, I think there's a couple of reasons. We cited in our papers other language in 524 which relates to when the injunction is imposed, and it says it must arise from a liability in which the debtor is a party to an action that involves property damage, personal injury, or wrongful death. And we don't feel that our failure to warn claims do not technically come within that. So then you look at the legislative history of 524G. It talks about channeling injunction with regard to direct or indirect claims or demands, present or future. That's a big universe. I understand where Your Honor is coming from, and our position is that if you look at the legislative history, it talks in terms of compensation to victims of personal injury claimants as opposed to... Well, it's not just that. Isn't the whole point of 524G to look at what the Johns Manville folks did and say, hey, that's a good idea. We want something. We want a mechanism, a procedural mechanism that will allow these companies facing crushing asbestos liability to get themselves washed completely clean. And we're going to frame the statute in the broadest language we can think of, direct, indirect, present, future, claims, demands. You call it what you want to call it. But whatever it is, if it's got something to do with asbestos liability, directly or indirectly, it's going through this injunction, and they're coming out the other side washed clean. If that's the intent of the statute, how can carving out something because you label it a failure to warrant claim, when it's all about asbestos liability in the end, be consistent with that legislative history that you're pointing to? Well, Your Honor, again, we think that if the statute is at least ambiguous in that respect, but to answer your question, the debtors or the claim proponents emphasize the fresh start, which you're proposing. We look at the legislative history as the primary reason. If you read the comments of Senator Heflin-Brown, it was more about increasing the rest to compensate victims as much as they can. And if you take our claims out of the trust and look at the reorganized debtor, that increases the pie for the victims. And we think being subjected to this process, which was designed to maximize the value for direct claimants, to use a term, and is biased against our claims, further supports our theories about why we shouldn't be included. It was drafted by the claimant's attorneys without any input from us. It seems like your argument itself got very close to categorizing your client's claims as an indirect claim as opposed to a direct claim. Well, Your Honor, to the extent Montana has liquidated its claim for $43 million, but we think we come within one of the exceptions which was found in the Owens-Corning case. So we think that the Frenville analysis applies to us, even with respect to that, because it was post-petition prior to when the plan was confirmed. So we think we fit within that. All I'm saying is, Your Honor, that the right to payment has been recognized by this court as due process concerns. Can you back up just a minute? How are you still suffering from the shadow of Frenville, as was put in Owens-Corning? Can you be more specific? What's the way in which you are similarly situated to the claimant in that case? Well, Your Honor, in Owens-Corning, Judge Ambrose found that Frenville still had continuing viability in two situations. And I don't have these committed to memory, so I'm going to have to read these to the record. The holding was, with respect to parties that were exposed to conduct giving rise to claims pre-petition, Grosvenor's was pre-petition, and Frenville was post-petition for pre-confirmation. And Owens-Corning was post-petition pre-confirmation. Right. And we're not saying that first exception applies to us, but we think that the second exception is, with respect to parties exposed to conduct giving rise to their claims post-petition, but pre-confirmation, Frenville would continue to apply to plans confirmed prior to May 18th. But that was because, specifically in Owens-Corning, there was no channeling injunction. There was no mechanism to provide due process for the claimant. I mean, I thought Owens-Corning was specific on that point. I might be wrong about that, but I'm pretty sure the court was expressed in saying that the due process safeguards in 524-GR have no help to the claimant, as Grosvenor's plan of reorganization did not provide for the channeling injunction or trust under that provision. In other words, they didn't have that benefit, and you folks do have that benefit. So that addresses any due process concern that you would have had, doesn't it? Your Honor, I think you might be confusing the Jeldwin decision with Owens-Corning. Owens-Corning had a channeling injunction, I believe, and that's the decision that we're really relying on. Every time I hear the word Frenville, Frenville to bankruptcy is like the word shank in golf. You don't want to use it. One time Judge Adams, who wrote Frenville, was being introduced, and he got a great introduction at a bankruptcy group luncheon, and he stood up and he said, you know, I really do appreciate it, but just remember, I'm the guy that wrote Frenville. And I understand it's been criticized, even by this Court, and reversed to a certain extent, but it is still the law in certain circumstances, and we think we fall within that second exception in the Owens-Corning right, because our right to payment didn't arise until we actually settled and made the payment. I apologize if I got the names crossed. Jeldwin or Grossman's, that's the one that says the issue about the channeling injunction should address the due process rights, correct? And Owens-Corning made a shift from pre-petition to pre-confirmation. So if the issue is due process, let's stick with Jeldwin slash Grossman's, whatever you're comfortable calling it. Why aren't any due process concerns that you say exist in this shadow of Frenville addressed by the fact that there is a channeling injunction? Because, Your Honor, we don't want to be – our right to payment, we believe, arises post-petition, even post-confirmation. We do not want to be relegated to a TDP process that we think is slanted and biased against us, and this doesn't work. Okay, so the point isn't that there isn't a process, it's that you don't like that process. That's one of our arguments, Your Honor. Which is a significant difference from Grossman's, right? Well, one of our arguments is that if we are relegated to this process, it is unfair to us, and I've cited a number of reasons. So that's sort of our third and final alternative argument. When you get down to the merits, before you sit down, it seems counterintuitive, I guess, that you're alleging that you may have a contribution or indemnity claim against Grace for matters that Grace may not have any underlying liability. I mean, a failure to warn isn't Grace's issue. A failure to warn is Montana's and the Crown's issue. That is correct, Your Honor, but we still may have a claim for contribution indemnification on the basis that they were the proximate cause of this failure to warn. I think the lower courts made this an either-or proposition, and I don't think that is correct or that is the law of all due respect to the lower courts. All right. Why don't we hear from Mr. Donnelly, then we'll get you back on the topic. Thank you, Your Honor. Thank you very much. Good afternoon, Your Honor. I guess I'll start with Montana since he was just up. First of all, on the failure to warn, keep in mind Grace was sued for failure to warn all the time as well, and also Montana and the Crown were sued on lots of theories other than failure to warn, failure to act, failure to regulate. If you look at the Crown's proof of claim, in fact, they say they were sued only for non-failure to warn theories. But the real point here on failure to warn is the legal theory doesn't matter. It's not the nature of the claim, it's the nature of the conduct. Is Owens-Corning implicated here? Owens-Corning is not implicated, Your Honor, because if you look at different periods of time, we're at Montana, they had one pre-petition claim. They had 219 claims asserted during the Chapter 11 case. Owens-Corning talked about due process and discharge issues relating to that time period. They have been fully asserted. They're not barred. There's no due process issue. If you speculate in the future for Montana, is it possible they would have future claims? Those are covered by Your Honor's point that the discharge, the channeling injunction under 524G applies here, and it really doesn't matter if it's a claim or a demand because Congress was comprehensive in this cleansing statute and channeled and joined, arranged to be paid any type of claim or demand no matter what it is. So the Wright v. Owens-Corning only implicates an issue of a hypothetical future claimant who might have a due process or discharge issue. If there was a barred date that they missed, perhaps that's that case. And it's not their case because they're here in court representing themselves, so they have no due process issue. And again, it's the nature of the 524G-1 and 2 for a claim, 524G-5 for a demand, say, it's the nature of the conduct. If the contribution or indemnity claim, the indirect claim, arises from conduct that gave rise to the injunction, it's channeled and enjoined, not the nature of the claim. I'm sure we'll be hearing about this from others too, but would you address the argument that claim and demand are mutually exclusive terms? Yes, sir. That's what I think of. I see what I call a hyperliteral reading of the statute in 524G-5A that says that. But if you look at 524, all of 524G, it's clear that the statute is using claim and demand interchangeably from time to time. So, for example, in 524G, the statute says a demand is defined, among other things, as a, quote, unquote, future, quote, unquote, let me find my note on that. A demand is defined in part as a, quote, unquote, present demand for payment. Now, that is, what is that? That's exactly the same thing as a current claim. Present demand for payment, exactly the same thing as a current claim. So, in the same statute, 524G is not using them as mutually exclusive. It's using a present demand and a current claim as the same thing. Now, they rely on another part of 524G, which is G-5A, the part that says a demand is a present or future demand for payment. That's a, not a claim during the proceedings leading to confirmation of a plan of reorganization. That's where they get the mutually exclusive argument. But I think the key thing there is you have to read the whole phrase. What does that mean when the statute says demand is something that's not a claim during the proceedings leading to confirmation of a plan of reorganization? And the legislative history is very, very helpful and instructive there. It's H10765 is attached to the third paragraph of the property damage FCR's brief because this comes up with Anderson Memorial as well. And what that legislative history says, I'm going to quote the key line, quote, from the beginning, a central element of the case was how to deal with future claimants, those who were not yet before the court because their disease had not yet manifested itself. So Congress is using the term, first of all, they're using future claim and future demand interchangeably again. And I think they are used interchangeably and overlapping a lot in this statute. And that's consistent with the purpose of making sure the injunction covers and cleanses everything. It doesn't really matter which one it's called. But Congress here is saying a future claim is one that's not yet before the court because the disease has not yet manifested itself. And there's 14 times in the legislative history in three pages where future claim, future demand are used interchangeably or synonymously. This is the problem we quoted a little bit in our brief from Judge Fitzgerald's opinion in Flintcote, where there's this very stark conflict between the mutually exclusive argument, if claim is something that's defined solely as where there's pre-petition exposure, and this legislative history that says a claim is something not before the court because disease hasn't manifested itself yet. Usually we pay attention to what Congress says in the statute, not what shows up in legislative history, right? But this is a case where if you follow their hyperliteral application, as Judge Fitzgerald said in Flintcote, you write the whole statute out of the book. It was a nullity and it was dead on arrival in 1994 when it passed because every, under their interpretation, every claim was pre-petition. Asbestos use stopped in the 70s. And so every claim, everything is a claim, there are no future demands, and the provision that says one of the statutory requisites is the debtor, the court has to determine that there's a substantial likelihood that future demands will exist. That provision can never be satisfied under their mutually exclusive claim and demand argument because everything's a claim, there's never a demand. And that's not something new that came up with Grossman's in 2010. That's something that was in the statute in 1994 because that 1015 expansive definition of a claim, that was law in every other circuit other than Frenville here. So it's an unusual situation where they have a literal reading argument, but there are these canons like kids versus wind. Supreme Court case says don't apply an absurd interpretation. There are cases like Ron Peer Enterprises. Griffin versus Oceanic Contractors don't go with an interpretation that renders the entire statute a nullity and is contrary to the legislative purpose. And that's what they have to do. They have to write the whole statute out of the books to make this mutually exclusive argument work. All right, what about, and they didn't, since you're on Montana, let's stick with Montana for a second. Yes, Montana and Canada. They didn't make this argument here, but certainly didn't at brief. They argue that the first in, first out rule is going to clearly result in disparate treatment, indirect claimants. Yes, sir. Now, assuming they're an indirect claimant, although they don't want to acknowledge being an indirect claimant, if they're an indirect claimant, why aren't they right in this FIFO argument? Well, for one thing, it sure doesn't hurt them, because they have this $43 million liquid aid claim that's going to be paid. That would be Montana. That paid on day one. That would be Montana. Yes. What about Canada? The Crown, well, you know, the FIFO provision is in every one of these GDPs, and the reason is this was a statute that anticipates claims being made over 20, 30, 40, 50 years, and you have to have a mechanism for paying claims that way. So it's been vetted in every case. This court in Federal Mogul said every 524G case has FIFO. It's the only sensible way to do it, other than they say the only fair mechanic is to wait 30, 40 years until every claim's in, and then don't pay anybody until then, and I don't think anybody thinks that's fair. So the FIFO, I think it's the only way to do it, and I think it's necessary and fair. But will there be money for their claim, to cover their claim? Yes, sir. That's Mr. Ostrand's testimony, the future claimants rep. He looked at that issue very specifically, and to the extent the Crown has a PD claim, because they have some Zona-like attic-filled PD claims. Judge Sanders, the property damage future claimants, looked at it. Judge Sanders testified there's reasonable assurance that the funds will be there. David Ostrand said it's likely the funds will be there for decades, and that's because of things like the procedures are the same for the currents and the futures. There are deferred payments. Grace makes $110 million and $100 million cash payment annually out to 2034. So there's this evergreen funding mechanism, and that's why Judge Ostrand concluded, yes, the funds will be there. Judge Fitzgerald adopted and credited that testimony. If you could turn to the Garlock. Yes, sir. Thank you. On Garlock, the gist of their argument, and I'm turning to the merits briefly at the start, because they're really focused on the fair and equitable test, and they've backed away from the absolute priority, always a term of heart, as I read their reply brief. But they're now saying, yes, sir. Before you go to the merits, you know, we spent a lot of time with the Garlock attorney on standing. Yes, sir. And I am interested, I'm intrigued that both sides said to the district court, in effect, hey, give us an advisory opinion. If you don't think they're standing, we'd like to know what you think of the merits anyway. Do you want to enlighten us on that? I'll be completely candid, Your Honor. It was a tactical decision because we felt the lower courts got standing right, but if we lost, we've been in bankruptcy 12 years, we didn't want to get reversed on standing and then have to go back down on the merits and lose another year or two of the case. That's all that it was. That's why we asked and Garlock joined us. We do think the lower courts got it right on bankruptcy standing. They have a higher standing under person aggrieved. What's the relevant injury that we should be looking at? The only – there is no relevant injury because – In terms of the analysis, what's the relevant injury that we should be looking at? The relevant injury would be if their Chapter 11 case is thrown out, if you speculate that it's thrown out totally and they're back in the tort system, you could speculate, and I think this is hypothetical. It's speculative. It doesn't pass the person aggrieved standard of an immediate and pecuniary impact, but you could speculate that at that point they'd be likely to have claims asserted in the future that would be impaired by the cap on damages and so forth. That's why we entered into the stipulation. We said if at the time there was no Chapter 11 and we said they'd be likely to have future demands, now with the Chapter 11 it appears highly unlikely they would ever have that situation. But that's the only situation I think where they might speculate if we have an injury in the future. If the Chapter 11 gets thrown out, they're back in the tort system. Well, if they've got people coming to them in their Chapter 11 and asserting liability against whatever trust they have set up, is there any basis or any reason or legal foundation for them to say, that doesn't take away the fact that we have some right to contribution that arise the minute we're sued or the minute there's a claim that comes up that's asserted, whether it's in bankruptcy or not, and we lose those rights because of this grace channeling injunction? I've heard them say it and I've seen it in a lot of briefs. I honestly don't follow their point on that, Your Honor, because contribution under Illinois law, where I'm from, all the states I'm familiar with, it really arises and becomes an injury once you get a judgment or a settlement and you're ready to hand over the paper, present the judgment or settlement or collect. So I've heard counsel argue that, but I don't follow their point. If there are future claims or demands made against Scarlock in connection against his bankruptcy estate, while it's in bankruptcy, in that situation, would there be standing? No, sir. Neither bankruptcy standing nor constitutional standing? I believe they fail on both on that, and that was the graph. Bankruptcy standing is a very, very low threshold. Well, I guess in a sense it's moot because the purpose of bankruptcy standing is to allow parties in interest to participate fully, and they certainly participated very fully. They even got supplemental hearings before Judge Buckwalter just for them standing in the merits. But what the absolutes say, there's just no injury at all. I think it's really different. Take, for example, in the Clinton New York case, New York City and the hospitals, they had the immediate impact from that line item veto, which was that their budgets and their finances and their treasuries were being impacted in anticipation of what would happen with that decision. It may have been a little thin, but there was standing. Here, there's just the automatic stay is a strong barrier, and there's just no impact on them now. I'm a little confused on my time. I should have checked. Is this eight minutes out of the 30 or out of the 20? Let's talk about, to your question, it's eight minutes out of the time that you took, and then they still get their time. All right. Thank you. Talking about staying with standing. Yes, sir. Second, Ann Garlock. How are they any more remote than the insurers in InReGlobal? The insurers in InReGlobal had an immediate impact of increased administrative costs. You have this 27-fold, very suspicious jump in silicosis claims. And even if the plan was insurance neutral, as the debtor argued there, they had this big jump in administrative claims. They don't have any comparable financial jump like that. That's how I distinguish global industrial, which I know is very broad in bankruptcy standing. We appreciate that. I don't think it was on Garlock or Brown or Montana. On Garlock, let's assume on Garlock, try to keep everything straight here. It's not easy. Just from a timekeeping standpoint. You're up to twice more. Just wait. We don't want to have to ask you later something we forgot. I was going to sit down and rest my voice, but Judge Fischer is coming back at me. I keep coming back. You have more time. I want to get you, keep you on your feet. Assuming we did find that Garlock had standing. Yes, sir. Okay. And it appears that they've abandoned the absolute priority rule argument. But what do you think in this context fair and equitable means? It's very similar, not identical, but very similar to that equitable balancing test courts do and confirming plans in 90-19 agreements all the time. When we cited Texaco and TMT Trailer, Ferry and Tribune and NutriQuest and all those cases. You look at the traditional set of equitable factors. Is it in a reasonable range of litigation probabilities? Was it arm's length? Was it good faith? How long and complex did it go on? Was it fair to creditors? Here, 99.5% of that class, the asbestos PI impaired class, voted in favor of this plan. And the bankruptcy court had a very full record, years of intimate oversight of the case here, oversight on the negotiations, the mediations before a former Judge Poynter, two trials, dozens of witnesses saw the risks of both sides, heard the testimony of Mr. Austern, then the future claimants rep. He has spent four years of due diligence with financial advisors, claim advisors, estimating and setting the asbestos liabilities, counsel very actively working. He was in the middle of the negotiations, the middle of the trial. They had this big dispute on the liability, $200 million to $468 million. We, the debtor, at that time said, the asbestos claimants said magnitude, order of magnitude higher, $7.4 billion. And it was settled 10 days into the trial because both sides were at risk. And Mr. Austern said, here's, he looked at both non-monetary factors and financial factors. He said there's a big downside risk and I'll, Mr. Frank will get up and explain this more in a minute. There's a big downside risk if we don't settle. In the middle, there's a huge risk that these other non-monetary benefits like the deferred payments going out to 2034 and then look at all the financial payments, $1.8 billion cash from the debtor, $500 million of insurance, $490 million of warrants, $1 billion plus in settlements contingent on the plan going effective from the former subsidiaries who had settled out of the fraudulent transfer litigation. And he looked at all of those and said, after doing aggressive due diligence, this is fair and equitable. And Judge Fitzgerald relied on that very, very powerful testimony, rich record, and we believe entitled to deference and abusive, certainly no abusive, not even close to abusive discretion, way over that, about as full a record as you can get. And that's where we come out on fair and equitable, just a very strong evidentiary record, Your Honor. I did have one question. Yes, sir. Just curious. There is an assertion from the Crown, their own, not Montana's, that, you know, Canadian citizens are getting the short end of this. They're going to recover vastly less. Yes, that's their property. They have a personal injury issue, and that's their property damage. And they say, well, this isn't fair because we're getting one-seventh as much as the United States claimants claiming on zonal attic insulation are getting. Yeah, why is that assertion not problematic? It is. There's no evidence in the record to support it. Absolutely none. It's just absent. There is an aggregate amount being contributed to the Canadian CII Fund of $8.6 million. There is an aggregate amount in the first three years of funds being contributed by Grace, Sealdair, and Fresenius to the U.S. CII Fund of $60 million. But you don't have the denominator comparing how many claims are going against those claims. There were a million CII claims in the United States, and we don't have any record of any in Canada. So the record is devoid. When did this come up for the first time, do you know? In their brief, I believe. I don't remember seeing it before. There's also a legal issue that 1120, Section 1123A4 of the Code, as I know your honors know, deals with discrimination among members within the same class. U.S. CII claimants are in Class 7B. Canadian ZAI PD claimants are in Class 8. They're different classes, so even if they had evidence, you know, it wouldn't be a well-taken objection. And with that, unless there are questions, I'll forego the rest of my time and turn the podium over to Mr. Frankel, the formerly counsel for the Future Claims Representative, now, as of last Friday, himself a Future Claims Representative. I'll get you back later. Good afternoon, your honors. I'm Roger Frankel. I represented David Allstern during the – since the time of his appointment in 2004 until his untimely death a month ago, and now speaking as counsel, but have been, as Mr. Donnelly indicated, appointed as the Future Claims Representative. Mr. Allstern was appointed by the Bankruptcy Court on motion of W.R. Grace to represent those that will assert personal injury demands, broad term, in the future. As soon as he was appointed, he hired advisors so that he could fulfill his duties as a legal representative. And as Mr. Donnelly indicated, he hired lawyers, he hired financial advisors, and most importantly, hired claims forecasters. These experts helped Mr. Allstern assess the complex financial and legal issues which affected his constituency. These experts were at his side as he helped negotiate the contributions that would be made to the 524G Trust pursuant to the plan. There were many factors for Mr. Allstern to consider during the 2008-2009 time period during these heated negotiations. There was significant uncertainty regarding the magnitude of the present and future as justice claims. There was significant uncertainty regarding the financial condition of Grace. And perhaps most importantly, there was significant uncertainty regarding the outcome of the estimation trial. As Mr. Allstern testified, settlement negotiations over the plan, and thus the contributions to the Trust, were arm's length, lively, and intense. Mr. Allstern testified at the confirmation hearing that the plan was fair and equitable to his constituency. He testified based on his own experience in this case and the advice of his experts. There was no expert, for that matter, no witness at all, that testified that the plan was not fair and equitable under 524G. In fact, Mr. Allstern was not even cross-examined by Garlock. And you're suggesting, as does Mr. Donnelly, that fair and equitable under 524G does not incorporate the absolute priority rule? Correct, Your Honor. And it's a balancing of the contributions to the Trust with the range of liabilities that are estimated. And the primary argument for that is what? Well, Your Honor, I think it's the sane reasoning of the language. It cannot mean absolute priority in the 1129 sense, because you have a 75% vote requirement that cannot be overridden, or at least it's not clear in the statute it can be overridden like it is in 1129B. So I think Mr. Allstern looked at this and took the common sense meaning of fair and equitable to mean, am I getting a fair contribution to the Trust in light of the potential outcome of the estimation trial, which was hotly contested? Wouldn't the primary argument be that fair and equitable is used in 524H, but it's not used in 524G? Well, it is used in 524G. It's used as a measure of the contributions to the Trust. 524H, referring to the manville, was a case that was already extant, I would say. But I think Mr. Allstern... Did your client or the district court make a specific determination as to whether or not Grace could have contributed more? I don't believe that there was a specific determination in the record that Grace could or could not contribute more. I think that the way this came out was a settlement of an estimation trial. And what was stark about that was that Grace's expert, and Grace had put on its entire case, was that it had somewhere in the neighborhood of $200 to $400 million present and future asbestos liabilities. The experts on the other side, the ACC and the future claims representative, were in the $7 billion range. So there was a lot of room in between to make a settlement. Grace could afford to pay a lot of that, but it was not clear at all to Mr. Allstern that Grace could afford to pay $7 billion. And for him to take the risk as a fiduciary that he's going to win the estimation trial is a risk that he really shouldn't be taking when there's an alternative, the viable settlement that was available to him. In order for the bankruptcy court to be convinced that it was fair and equitable, didn't the bankruptcy court have to evaluate how much W.R. Grace could contribute? Your Honor, I don't think it had to evaluate how much they could possibly contribute. I think they had to evaluate that it was a fair amount that it was contributing under the settlement. I think that's what was critical. And you have to put in perspective Grace's financial condition was changing during this whole case. I mean, when Grace filed for bankruptcy, it was teetering. And we go through the case, Grace is doing better. But even as we're negotiating back in 2008 in the heart of the financial depression or recession that we were in, it was not at all clear how much Grace could pay. I think what the court evaluated was is this a fair amount considering all of the different factors. Even if the absolute priority rule is not incorporated into 524G formulation of fair and equitable, should it give us pause that the equity holders have everything and the claimants get 25 to 35 percent? I think that the deal that was made, the settlement that was made, was fair at the time and is still fair. It's a lot of money that's going into the trust. Grace has an obligation to pay $1.5 billion over 15 years going out. I understand your argument, but I'm asking, I hope, a more particular question, which is you've made the pitch and we've heard it, that the absolute priority rule is not embedded. It's not a term of ours. It may be in 1129, but it is being used in a broader sense in 524G. Taking that as for purposes of discussion that we accept that, does that mean that the fact that the equity holders keep 100 percent is irrelevant, or is that something we should be paying attention to or properly could pay attention to? Your Honor, I do believe that for this purpose, for the purpose that Mr. Austin looked at this, it is irrelevant. In other words, we think that the fact that the shareholders retain equity and retain a sizable amount of equity might have happened the way it happened or might not have. At the time that this deal was negotiated, all of that was taken into account by Mr. Austin and his experts. It wasn't just Mr. Austin. And the stock was something. Don't forget, one of the contributions to the trust was a warrant. So the trust benefits from the stock being as high as it was. So all of those things were taken into account. Thank you. Let me just go back to the fair and equitable. Fair and equitable words are used in three places in the Code, right? 524G, as you note, 524G, 4B2, and 524H, and also 1129. 1129, you're saying, means something different, in effect, than 524? I think that is what I'm saying because 1129 defines how the fair and equitable treatment, for instance, by allowing the cram down, and you can essentially vote that the treatment is fair and equitable, override the fair and equitable treatment. I don't think that same provision, that same language, is in 524G, and I don't believe it's an oversight that it's not in 524G. They require a 75 percent, a very high majority, of present claimants. They require a futures representative. And if you have the support of those two constituencies, I believe Congress is saying, yes, you can have a contribution that is fair and equitable without meaning absolute clarity. How does fair and equitable under 524H mean something different than fair and equitable under 524G? I believe it does, Your Honors, but honestly, I would pass to Mr. Lockwood on 524GH. That's a great segue to Mr. Lockwood. I've seen this red light on for so long. Thank you. Good afternoon, Your Honors. With respect to 524H, you have to remember that Manville had two different proceedings, the original bankruptcy and bankruptcy discharge and a 105 trust. The original trust passed claims through into the tort system for litigation. As a result of the influx of claims way in excess of those expected, the Manville Trust began to run out of money. Judge Weinstein issued a show cause order directing everybody to come in and address the perspective and solvency of the Manville Trust, which was not eligible for bankruptcy. But does 524, fair and equitable under 524H, mean something different than fair and equitable under 524G? Under 524H, it refers to the absolute priority rule. It specifically refers to 1129. Right. And it refers to that because it said 524H said that that absolute priority rule had to be applicable to any pre-524G case, such as Manville or UNR. And Manville, in fact, the absolute priority rule was applied to. If you read the decision, there was a dissenting group of equity shareholders who claimed that another group of shareholders shouldn't participate. In Manville, by the way, the shareholders retained 20% of the equity of the company, thus demonstrating that it is okay in the legislative history to have some equity retained. In this case, as Mr. Frankel pointed out, the trust got 10% of the equity, in effect, through the issuance of the warrant to the trust. So there's really the 524H does refer to 1129 and was satisfied in Manville. Doesn't it seem incongruous that you would have the same term used in one subsection and the immediately subsequent subsection you have the same term used, but it means something different? Well, in 524G – I mean, the first one you're saying is just sort of, you know, whatever a judge thinks is fair and equitable. The second is very different because you're saying it refers to 1129. 1129, therefore, is that H incorporates the absolute priority rule, but G doesn't. H extends a requirement that the absolute priority rule have been applied in certain historical cases that had already been completed at the time the statute was drafted. I mean, just pure statutory construction. This is theory now. Right. Doesn't it seem incongruous that you would interpret the same term in one subsection different from the way you interpret it in the immediately subsequent subsection? Well, in the first subsection, it's defined in very specific terms, and it requires you to measure the contribution to the trust against the benefits received by the party making the – You're still not answering my question. I mean, it has to seem incongruous, but there's an answer to it is what you're saying. Yeah, I mean, part of the problem, I think, arises that the term, as Your Honor just said earlier, fair and equitable is a term that judges and lawyers use in courts of equity all the time, including courts of law. But in bankruptcy, at least in certain places in bankruptcy, it is a term of art. In certain places, it is, and in certain places, it isn't. I believe – I think bankruptcy judges and there's court decisions that talk about the treatment of creditors in a bankruptcy case has to be fair and equitable. The term is a term that is sort of situational, if you will. If you look to whatever it is that's being evaluated in the sense that creditors – Can you imagine making that argument to Justice Scalia? In G, it's just situational, and H, well, it's not. Well, no, in G, it's not situational. In G, it's very specific, defined. And in 1129B, it's also – it says fair and equitable means, and then it lists a number of subsections, and one of those is the absolute priority subsection. But it doesn't say absolute priority equals fair and equitable. It says fair and equitable includes, and one of the tests is the absolute priority rule, thus demonstrating, as I believe one of the appellants has argued, that fair and equitable is not limited to the absolute priority rule, even in Section 1129B itself. You might – I understand the question. I'm not sure I fully understand your answer, but the answer might be in the text of 524H. It specifically refers to 1129.  I mean, it might not be any more complicated than that. Well, I thought the question sort of subsumed that as being inadequate. The argument, again, I was trying to give the historical context. Would it be that the drafter simply forgot to put it into G? I don't think so, Your Honor, because bankruptcy plans are consensual. If you put it into 524G, how would it work? It would say that you couldn't create a trust if equity retained any value. Manville itself retained 20% of the value. Why would Congress have decided, based on a precedent where the shareholders of Manville were retaining 20% of the equity of the company, to apply a rule that said you could never have a 524G trust if the debtor setting that trust up, no matter how small the asbestos liabilities were, retained any equity? Why would you want to do that? What would be the legislative purpose behind that? A couple of minor points, Your Honor. With respect to the question about the FIFOQ that Judge Fischer raised, I would point out that the manner in which that FIFOQ, being at the end of it, is protected is through the operation of something called the payment percentage in the TEP, which is established by the respective claims estimators for the futures representative and the present asbestos claimants. And the purpose of that is to make sure that throughout the 40-year life of a trust, the payment percentage will remain the same. And there's a specific statutory provision in 524G, it's 524G2B25, that says specifically the trust will operate through mechanisms such as structured, periodic, or supplemental payments, prorouted distributions, matrices, or periodic review of estimates of the numbers and values of present claims and future demands to ensure that the trust will value and be in a financial position to pay present claims and future demands that involve similar claims in substantially the same manner. That is the provision that has resulted in the creation of payment percentages and the protection of people in the latter part of the queue. Let me ask you a quick question. If my colleagues will indulge me, because I know your red light's been on a bit here. But, Mr. Lockwood, there's the assertion that the trust advisory committee is unfair because it includes attorneys that represent asbestos claimants. In some fashion, there's unfairness in the structure itself. Do you want to respond to that, please? Sure, Your Honor. The role of the TAC, as testified to below, is to essentially represent the constituency of present claimants as opposed to the future claimants representative who represents the future claimants with respect to the trust. And in that capacity, as the trust agreement and our papers point out, the role of the TAC is very limited, very high level, supervised. The TAC does not get involved in the resolution of individual claims, and thus the TAC members are not in a position to affect the processing of their firm's individual claims. And indeed, they're also dealing with the rights of lawyers and their clients who they don't represent in their capacity as that. And finally, anything that they do has to be agreed to by the trustees and the future claimants representative. And if either of those two separate sets of fiduciaries disagree with the TAC and there's a dispute, the bankruptcy court retains jurisdiction under the trust agreement to resolve the dispute. So their power, even with respect to the high level advisory capacity that they operate at, is very limited. And so we think that these TACs have been used in all of the cases, again, going all the way back to Manville where it's called the Select Council for the Beneficiaries. One final point, Your Honor, has to do with the JIT case, which I had the fortune of arguing in front of you. The point here is that in JIT, the insurance companies Judge Jordan held had been denied the opportunity to participate in the bankruptcy case as a result of the denial of bankruptcy standing. Here, as Judge Jordan pointed out, they were not so denied. Garlock has agreed that the evidence that they helped generate was fully presented and that they could reach the merits. The issue here is appellate standing. We are now through. In JIT, you held that the appellate standing issue didn't apply. I think we dealt with it. The bankruptcy standing is fairly easy to meet. It's the appellate standing that's the issue. Right. The appellate standing is the issue that we would prioritize. All right. Thank you. Thank you. Mr. Casada? If you could just talk about briefly the fair and equitable issue that we were talking about relating to 524G and H. Yes, Your Honor. We believe fair and equitable means one of two things. Either it has its precode term of art meaning, as set forth in the case v. Lumber and Voight and other cases, term of art recognized over 70 years of Supreme Court opinions, and that is that the creditors are entitled to be paid before stockholders can retain a right of property for any purpose. But you're a drafter of a legislative provision, and if you put in there that future demand holders have to be paid in full, even though you don't necessarily know who those future demand holders would be, that seems to be an extension of absolute priority that goes way too far. Well, I would respectfully disagree, Your Honor. Certainly. I'm sorry? I'm just being practical. Explain the practicalities. The other side here has said if that's the rule, you can't make one of these things function because Congress never intended to take everything away and undermine the existence of the company completely. I take that to be the gist of their argument. Why are they wrong? Well, because the parties could agree what the full liability is, and they certainly could have agreed in this case that the $3 billion that is being contributed by Grace and others would pay the liability in full, and in that case, in their judgment's provision, they would say that any creditor who actually takes the trust to trial gets paid 100 percent, and then the question is whether that plan is true. What's the purpose of having a 75 percent majority in the statute itself if not to address that kind of concern, that Congress understood, knows how these things work, and said, look, if you get three-quarters of these classes to agree to it, then that's good enough for us. Run with it. But that's not what Congress said. Congress said you need to vote, and that's under one provision. Then under a completely separate provision said that naming the debtor in the injunction with respect to future claimants has to be fair and equitable with respect to future claimants in light of the contributions of the debtor. So that's asking the question, how much must a debtor pay to be completely cleansed of its asbestos liability? It's basically directing the court to measure the amount of the benefit of the trust of the debtor, here the magnitude of discharge, against the contribution that debtor is making. What's the response to Mr. Lockwood's statement that that couldn't be what it meant because 524G was meant to embody the Manville method, and that in the Manville case, they had 20 percent of the equity that they kept, so just historically it doesn't add up? It's not clear that it intended to adopt that aspect of Manville, and that explains the difference between 524G and 524H. Isn't one way to explain it just the way Judge Fisher did? 524H specifically, explicitly refers back to 1129B. 524G doesn't, and Congress knew how to refer to it when it wanted to, and when it didn't want to, it didn't. No, in 524G, Congress is referring to the term of art. In 524H, it's referring to 1129B, which are different things. If you read Justice Souter's opinion in the Bank of America case, he recognizes that. He says that 1129B did not codify the precoded version of fair and equitable, the term of art. It's a more lax definition of fair and equitable, and all 524H recognized is that these past cases that we want to give the blessing of this statute, they wouldn't have applied, they wouldn't have known to apply 524G and fair and equitable, which Congress knew was a term of art when it passed, when it enacted 524G. So they basically said as long as you, there was a court determination that the plan was fair and equitable, within the meaning of 1129B, which is the only fair and equitable test that existed when those cases came along, then those injunctions are blessed and you get the same kind of protection as if there were 524G. But essentially, there are two different understandings of what 524G, or excuse me, what fair and equitable means. There's the precoded term of art, and I agree, it means general fairness, but it includes within general fairness an understanding that creditors get paid before shareholders participate. That's a bare minimum of fair and equitable. It includes before future demand holders get paid as well. 524G says that the court must determine that naming a debtor in an injunction will be fair and equitable to persons who might assert demands or future claims. So yes, there has to be a determination that future claims will be paid in full before shareholders participate. That's what fair and equitable, that's what the term of art means, and that has to be, we submit, what Congress meant when it used that term, fair and equitable. So the reason that 1129 is not referenced in 524G for B2 is what? Is because Congress was not adopting 1129B. It was adopting the term of art as explained by Justice Souter in Bank of America, the term of art that existed before the code. That term of art was described in case after case, the case B, lumber case, the Boyd case, and most recently in the Bank of America case. And that term of art says that the holder of any claim or interest that is junior, excuse me, that's the code, that creditors are entitled to be paid before shareholders can participate. That's what the term of art means. Congress, we believe, knew that when it enacted 524G, and that's what it meant in this case. But doesn't the Bank of America case say the exact opposite? No. The Bank of America case was trying to determine whether within the fair and equitable definition that was adopted in 1129B, whether the language there had made room for a new extension of value, exception to absolute priority. And the code and the court in that case said that the debtor didn't qualify, the debtor's claim didn't qualify before, but acknowledged that there was room in the formulation of fair and equitable under 1129B for a new value exception. But the court recognized that there was a difference between fair and equitable under 1129B and fair and equitable under the precode version. In our position, we haven't abandoned, as suggested by the debtors, our absolute priority rule argument. What we've said is we're not arguing that 1129B applies. We're arguing that fair and equitable, as defined by the Supreme Court, applies. Thank you very much. Okay. Thank you very much. Mr. Monaco. Thank you, Your Honor. I know we're over the limit, so I promise to be brief, and I'll address just a couple of the arguments made by Mr. Donnelly. In response to Your Honor's questions about due process, Mr. Donnelly seemed to focus on notice, but it's really about, it's more than notice. In the Gell-Mann case, it's more about our right to assert future claim or future rights to payment. And if the court agrees with us, then we're permitted to go against reorganized debt. Yeah. The problem I keep coming back to is that it's hard for me to conjure that the debtors didn't warn the citizens of Montana or citizens of Canada with regard to a possible problem that's being alleged against the sovereign. It's not really being alleged against the debtors or against Grace, is it? I'm not sure exactly what you mean, Your Honor, but – There's a failure to warn. Yes, there's a failure to warn. Is there a claim being made against Grace that they failed to warn? I think there might be. I'm not entirely sure about that. My only point is that if we're right in our arguments, then we have the right to go against reorganized debtor, and the pie decreases for the direct plaintiffs. If you agree with the plaintiff proponents or the debtor more specifically, then we're reduced to going against the trust in a tortured process. It's going to decrease the pie for the victims. And I think the legislative history – When you say it's going to reduce the pie for the victims, there's more than one interest in play here. I mean, the fact that there would be more for victims necessarily means you're – and you could go against Grace outside necessarily means there's more liability for Grace. As a practical matter, why would we – why should we accept the argument that that's what Congress intended when it set up 5.14, Mr. Monahan? Well, Your Honor, I was just going to briefly – and I'll just read it very quickly. Senator Brown says, This amendment is about growing the pie available to victims. Senator Heflin states, The injunction provision is simply about growing the pie available to pay victims. Well, it can't be simply about that, right? Even if one senator said it was simply about that. This is a complicated legislative fix for a complicated problem, and even you have acknowledged, I think, that part of this is a fresh start. I mean, that's a piece of the puzzle. Aren't you asking us to focus on one thing for the exclusion of that other in a way that the statute sort of seems to counsel against? Someone's ox is going to be gored. That's what this is about. And I understand the Court's dilemma. You're balancing. All I'm suggesting to the Court, respectfully, that if you – it would not do injustice or violate the spirit and letter of 524G, contrary to what the plan proponents say, if you were to adopt Montan and the Crown's argument. Well, could you respond to the argument that they've made, that if we were to accept that argument, 524G just craters? Their assertion is that that effectively renders the statute annullity. Your Honor, I do not agree with that. I think that's what I just said, is that if we're permitted on our future right to payment to go against Grace, Grace has stated in testimony, I think it's in our papers, that they have the ability to pay a $750 million contribution indemnification judgment. That could be. For purposes of this discussion, let's take it out of this case for a second. As an abstract legal matter, if we accept the theory you're propounding, what is to prevent every indirect claimant from saying, well, that doesn't mean us, hence increasing the liability for a future debtor and making these kinds of – the use of this kind of mechanism ineffective? Well, Your Honor, I think if it had been handled differently at the bankruptcy court level, whether it be giving a separate class to indirect claimants or setting up a separate fund, we might not be here today. Did you guys ask for a separate class? Your Honor, I think we did put it in our papers that we were subject – we were not subject to – we should not be part of Class VI. But we were different. That is a mantra that we have been saying over and over again. You said you were different, but that's interesting. Okay. Good. Thank you very much. Thank you. Thank you to all counsel for very well-presented arguments and also well-done briefs. Take the matter under advisement and call the –